UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE:

PUBLISHERS CONSORTIUM, INC.,
    Debtor,

AMERICAN NATIONAL BANK &
TRUST COMPANY OF CHICAGO,
    Plaintiff/Appellee

VS.

COMMON COURAGE PRESS, INC.,
NATIONAL JOURNAL, ARSENAL
PULP PRESS, BLACK BOOKS,
CHILD MANAGEMENT, INC., COMIC
ONE CORPORATION, DARK HORSE
COMICS, INC., IMAGE COMICS,
INC., ODONIAN PRESS/GOLDSTEIN
& BLAIR, LLC, TERRACE
PUBLISHING, and MCBOOKS, INC.,
    Defendants/Appellants

FILED
2004 DEC -9 P 5:38
U.S. DISTRICT COURT
HARTFORD, CT.

Civil Nos. 3:03cv00002(AVC)
3:03cv00003(AVC)
3:03cv00020(AVC)
3:03cv00021(AVC)
3:03cv00023(AVC)
3:03cv00024(AVC)

### MEMORANDUM AND ORDER VACATING JUDGMENT OF BANKRUPTCY COURT

This is a consolidated appeal from an order of the United States Bankruptcy Court for the District of Connecticut (Dabrowski, J.), confirming the debtor, Publishers Consortium Inc.'s plan of reorganization under Chapter 11 of the United States Bankruptcy Code, and entering judgment for the appellee, American National Bank and Trust Company of Chicago, in adversary proceeding no. 02-03048.

Reversed and remanded.

## FACTS

Examination of the record below discloses the following undisputed facts. The debtor, Publishers Consortium Inc., ("the consortium") was for many years a major publisher and distributer of books. As part of its business, the consortium entered into consignment agreements with various other publishers, that is, the appellants herein-- Common Courage Press, Inc., National Journal, Arsenal Pulp Press, Black Books, Child Management, Inc., Image Comics, Inc., Odonian Press/Goldstein & Blair, LLC, Terrace Publishing, and McBooks, Inc. (hereinafter "the publishers").

Although each of the consignment agreements differed in minor respects, all contained essentially the same terms and conditions relevant herein. The consignment agreements provided that the publishers would consign books to the consortium and that the consortium would perform services customarily performed by a book distributor, including marketing, invoicing, shipping, customer service, collection of accounts receivable, warehousing, receiving and processing of returns. The agreements further provided that the books would remain the property of the various publishers until sold to customers, with the publishers having sole discretion to set retail prices for the books. Typical customers included large retailers and wholesalers. The publishers were responsible for the consortium's costs incurred in shipping, storage, promotion, and advertising. Upon sale to

customers, the consortium reported the sale to the publishers and paid the publishers the book price less a commission and service costs. Payment typically was due ninety days after the "report date," that is, a scheduled day each month when the consortium reported to each publisher the total sales and the net amount due to that publisher.

The consortium was obligated to pay the publishers regardless of whether the consortium was paid by the purchasing retailers or wholesalers. The agreements did not obligate the consortium to segregate funds according to sales of a particular publisher's books and the consortium did not do this. The consortium was not restricted on the use of payments received from customers. The publishers had no direct contact with the consortium's customers, and always logged receivables as due from the consortium, rather than from any of the customers who bought the books.

In 1999, the consortium obtained a revolving line of credit from the appellee herein, American National Bank and Trust Company of Chicago ("the bank"). As part of a loan and security agreement for funds drawn on the account, the bank obtained a Uniform Commercial Code Article 9 security interest in the consortium's accounts receivable and contract rights.

The security agreement stated, among other things, that:

> Borrower grants to Bank a security interest in and to, the following Borrower's property,

> wherever located, whether now or hereafter
> existing, owned, licensed, leased (to the
> extent of Borrower's leasehold interest therein),
> <u>consigned (to the extent of Borrower's
> ownership therein)</u>, arising and/or acquired,
> including without limitation all of Borrower's:
> accounts. . . contract rights. . . (emphasis
> added).

On January 20, 1999, the bank filed a UCC-1 financing statement covering accounts and contractual rights. The security agreement defines "accounts" as "all present and future rights of Borrower for payment for goods sold or leased or for services rendered, which are not evidenced by instruments or chattel paper, and whether or not they have been earned by performance." The security agreement does not specifically define "contract rights."

On August 29, 2001, the consortium subcontracted with Client Distribution Services, Inc. ("CDS") to perform its book distribution operations beginning November 1, 2001. The consortium transferred all books located at its warehouse in Illinois to CDS's warehouse in Tennessee. The consortium delegated its duties to CDS pursuant to an "Agency Fulfillment Agreement" whereby CDS took over the warehousing, order receipt, order processing, shipping, invoicing, collection and CDS's book returns processing obligations. CDS also assumed the risk of publisher non-payment. The consortium retained its obligations to market, report, and to remit funds to the publishers collected by CDS on publisher invoices. The consortium continued to

provide the publishers with monthly reports of books sold and the amounts due. The consortium's president, David Wilk, testified that the consortium entered into the Agency Fulfillment Agreement because CDS could perform various "back office" functions more efficiently than the consortium. The publishers played no role in the consortium's negotiations with CDS, and in fact, the publishers knew nothing of it. Gilbert Perlman, the president of CDS, testified that CDS was not set up to administer relationships with so many small publishers.

One week after entering into the Agency Fulfillment Agreement, Wilk sent an e-mail to the publishers, entitled "BIG AND GOOD NEWS" which stated in part:

> We will merge our warehousing, shipping, and billing operations into those of CDS, so that [the consortium] can focus on our sales, marketing and strategic planning services <u>to our client publishers</u>.
>
> On Monday we will announce publicly that beginning November 1, 2001 [the consortium] distribution services will be outsourced to CDS. The CDS distribution center, in Jacksonville, Tennessee, is now one of the largest, and most efficient independent operations of its kind in the US book trade in the United States.
>
> Fully modernized, and operating with the highest levels of efficiency and accuracy, CDS provides <u>a significant service benefit to [the consortium], and therefore, our customers as well as our clients.</u>
>
> . . .

> Both companies have a clear vision that by working together, our unique strengths will <u>benefit [the consortium's] client publishers in significant ways</u>. (Emphasis added).

Attached to this e-mail was a joint press release by CDS and the debtor that had been published in Publishers Weekly, the general trade magazine of the book industry. The press release states in relevant part:

> [the consortium], a leading distributor of independent publishers, with offices in Chicago, Illinois and Milford, Connecticut, today announced a new strategic alliance established with [CDS], the largest independent provider of distribution services in the US book trade.
>
> . . .
>
> Under this new alliance <u>[the consortium] and CDS will partner to provide distribution to a wide range of publishers</u>. . .
>
> CDS offers the <u>highest quality distribution services for publishers</u> of all sizes including warehousing, fulfillment of orders, and collections. . .
>
> CDS is known for its innovation and providing distribution services in systems to young and growing publishers from around the world. (Emphasis added).

From and after November 1, 2001, the publishers delivered their books directly to the CDS warehouse. CDS acknowledged that it received the books on consignment and that the books remained

the property of the publishers until shipped to the customers. CDS then invoiced the customers in its own name, collected payments, and placed these funds in its general operating account without segregation from other monies received. The agreement required CDS to pay the consortium 88 days after the monthly report date, thus allowing the consortium 2 days to pay the publishers within 90 days of the report date. The consortium was obligated to pay the publishers regardless of whether it had received payment from CDS or a customer.

On March 28, 2002, CDS wired the payment for books sold in December 2001 - the sum of $1,095,860.76 - to the consortium's account at the bank. On the same day, the bank exercised its right to set-off and removed these funds from the consortium's accounts. Due to this set-off, on April 2, 2002, the consortium filed a petition in the United States Bankruptcy Court seeking protection from creditors under Chapter 11 of the United States Bankruptcy Code. On April 26, 2002, the bank commenced an adversary proceeding against the consortium and the publishers, seeking a declaratory judgment that the consortium owned the accounts receivable due from CDS and the proceeds paid by CDS and that the bank had a first priority lien in such accounts and proceeds. The publishers answered and asserted counterclaims, arguing that as the owners of the books consigned to CDS and the consortium, they had the right to the proceeds of sale and that,

in any event, they were entitled to the sale proceeds as third-party beneficiaries of the Agency Fulfillment Agreement between the consortium and CDS.

On August 7, 2002, the bankruptcy court issued an order providing for a trial of the common issues presented in the adversary proceeding and the plan of confirmation process. A three day trial thereafter ensued and, on November 20, 2002, the bankruptcy court issued a decision concluding that the consortium was the owner of the accounts receivable and the funds due from CDS for pre-bankruptcy petition sales. The court further concluded that the publishers were not third party beneficiaries of the Agency Fulfillment Agreement, finding that "CDS did not intend to benefit the publishers by providing them with rights in the book proceeds through the CDS agreement or in any other manner" and that "there existed no facts capable of granting [the publishers] third-party beneficiary status." The court further concluded that the bank had a valid security interest in the funds. On November 26, 2002, the court issued an order confirming the consortium's plan of reorganization and, on November 27, 2002, the court entered judgment on the adversary proceeding in favor of the bank and against the publishers. This appeal followed.

## STANDARD

On appeal, a district court "may affirm, modify, or reverse

a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. Bankr. P. 8013. A district court reviews a bankruptcy court's conclusions of law under a <u>de novo</u> standard of review. <u>In re Ionosphere Clubs, Inc.</u>, 922 F.2d 984, 988 (2d Cir. 1990). In contrast, a bankruptcy court's findings of fact will not be set aside unless they are clearly erroneous. Fed. R. Bankr. P. 8013. <u>In re Manville Forest Products Corp.</u>, 896 F.2d 1384, 1388 (2d Cir. 1990).

## DISCUSSION

1. <u>Ownership -Accounts Receivable/Proceeds</u>

The publishers first argue that the bankruptcy court erred in concluding that the consortium owned the accounts receivable and the proceeds arising from the sale of their books. The publishers maintain that they furnished CDS and the consortium books based on consignment and, hence, never relinquished ownership to them. The appellant, McBooks Press, Inc., argues in the alternative that CDS, as the middleman, owned the accounts receivable "due to its possession of and control over [them]", and accordingly, the consortium had no accounts receivable for a bank to claim a security interest. Moreover, McBooks contends that the Agency Fulfillment Agreement between the consortium and CDS was, in fact, a debtor/creditor relationship, did not make CDS the consortium's agent under the circumstances presented

here, or give the consortium contract rights to the proceeds so as to permit the bank to claim a security interest.

In response, the consortium and the bank assert that, because the publishers never insisted by contract or otherwise that the consortium segregate funds received for books sold on consignment, these funds became the property of the consortium subject to offset by the bank.

Section 9-203 of the Uniform Commercial Code provides in pertinent part:

> (a) Attachment. A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral. . .
>
> (b) Enforceability. . . A security interest is enforceable against the debtor and third parties with respect to the collateral only if
>
> (1)  \*\*\*
>
> (2) <u>the debtor has rights in the collateral</u> or power to transfer rights in the collateral to a secured party; (emphasis added)

\* \* \* \*

Whether the debtor has property rights to the collateral is initially a question of state law that depends on issues of fact. <u>In re Bellanca Aircraft Corp.</u>, 850 F.2d 1275, 1278-79 (8th Cir. 1984). "[O]nce that determination is made, federal bankruptcy law dictates to what extent that interest is property of the [bankruptcy] estate." <u>In re N.S. Garrot & Sons</u>, 772 F.2d 462,

466 (8th Cir. 1985).

Under state law,[1] where a debtor is under no obligation to segregate proceeds or hold them in trust for the benefit of a third party, a debtor/creditor relationship, rather than an agency relationship, is established. In re Rine & Rine Auctioneers, Inc., 74 F.3d 854, 860 (8th Cir. 1996). This is so even when the arrangement between parties with respect to the property is a consignment. Id. If an agency relationship exists, the property is in the debtor's hands as agent and is not treated as property of the debtor's estate. Id. However, even where an agency relationship exists, once the debtor commingles funds and it becomes "impossible to actually trace the principal's own money, the relationship ha[s] to be treated as a creditor-debtor relationship under the bankruptcy Code with respect to those disputed funds." In re Rine & Rine Auctioneers, Inc., 74 F.3d 854, 860 (8th Cir. 1996); see also Snap-On Tools Corp. v. Rigsby, 18 B.R. 518, 521 (Bankr. E.D. Va. 1982).

In this case, the bank obtained an Article 9 security interest in the consortium's accounts and contract rights, with the security agreement specifically providing that:

---

[1] The appellants aver, and the appellees do not dispute, that the law of Tennessee governs the extent to which the consortium had rights to the collateral. Having examined the law of the state of Tennessee governing debtor-creditor and agency relationships against the same law in other states, the court is unaware of any appreciable difference that would be material to this matter. Hence, the court looks to state law in general.

11

> [The consortium] grants to Bank a security
> interest in and to, the following
> [consortium's] property, wherever located,
> whether now or hereafter existing, owned,
> licensed, leased (to the extent of the
> [consortium's] leasehold interest therein),
> <u>consigned (to the extent of [the consortium's]
> ownership therein</u>), arising and/or acquired,
> including without limitation all of
> [the consortium's]: accounts. . . contract
> rights. . . (emphasis added).

On March 28, 2002, CDS wired $1,095,860.76 to the consortium as payment for books sold in December 2001. These funds then became the property of the consortium. Although the publishers had furnished the books based on consignment, they did not require the consortium to segregate the proceeds of sale from other funds held within the operating account, and the consortium did not do this. With respect to these proceeds, then, the publishers became simple creditors of the consortium. The bank therefore properly exercised its rights to set off against the collateral pursuant to the security agreement.

Equally without merit is McBrooks argument that the bank could not exercise its right to set off. In McBrooks view, CDS owned the accounts receivables - not the consortium - and hence, the bank's attachment constituted an invalid exercise of the security agreement because the bank only had the right of set off with respect to the consortium's accounts receivable. However, as part of the security agreement, the consortium pledged whatever contract rights it had to any property. The consortium

had rights to the funds pursuant to its contract with CDS, that is, the Agency Fulfillment Agreement.

2.  Third Party Beneficiary

The publishers next argue that the bankruptcy court erred in rejecting their argument that the consortium and CDS, through the Agency Fulfillment Agreement, intended to grant the publishers ownership of the proceeds as third party beneficiaries. The publishers maintain that, as the Agency Fulfillment Agreement is governed by the law of the state of New York and, in New York, the court may look to surrounding circumstances to determine whether the parties intended for the publishers to be third party beneficiaries, the bankruptcy court erred in concluding that they were not. These circumstances include that, as set forth in the Agency Fulfillment Agreement, the consortium hired CDS to "distribute books" for the publishers and CDS undertook to perform services for the publishers, including billing and warehousing, with CDS agreeing to pay the consortium in time for the consortium to pay the publishers. Further, the publishers assert that an e-mail and press releases issued by the consortium demonstrate that the consortium intended the Agency Fulfillment Agreement to provide a very substantial benefit to the publishers. Consequently, the publishers maintain that they were third party beneficiaries of the agreement, and the bankruptcy court erred in rendering a conclusion to the contrary. The court

agrees.

"[T]he appropriate test for third party beneficiary status is a question of law that [the court] review[s] de novo. 258 F.3d 1349, 1353 (Fed. Cir. 2001). "In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." Glass v. United States, 258 F.3d 1349, 1353 (Fed. Cir. 2001); see also Owens v. Haas, 601 F.2d 1242, 1250 (2d Cir. 1979). "While such a beneficiary must derive more than merely incidental benefit from the contract . . . an intention to benefit a third party may be gleaned from the contract as a whole and the party need not be named specifically as a beneficiary." Id. (quoting Newin Corp. V. Hartford Accident & Indemnity Co., 37 N.Y.2d 211, 219, 371 N.Y.2d 884, 891, 333 N.E.2d 163, 167 (1975); see also Cutler v. Hartford Life Insurance Co., 22 N.Y. 2d 245, 253 (1968) (rejecting the argument that only a named payee of a contract can be considered a third party beneficiary because third party beneficiary law looks to "the ultimate intended beneficiary" based upon the manifested intention of the parties as determined from the circumstances surrounding the agreement, even though the agreement itself calls for payment to another party).

At the conclusion of trial, the bankruptcy court concluded

that the publishers were not third party beneficiaries of the Agency Fulfillment Agreement, stating that "CDS did not intend to benefit the publishers by providing them with rights in the book proceeds through the [Agency Fulfillment Agreement] or in any other manner" and that "there existed no facts capable of granting [the publishers] third-party beneficiary status." This was error, as the evidence plainly shows an intention to directly benefit the publishers. While the Agency Fulfillment Agreement does not mention any publisher by name or designated them as named payees, the circumstances presented here manifest a clear intention to make the publishers the ultimate intended beneficiaries of the agreement, to include such benefits as warehousing, order processing, invoicing, and collections. The agreement reflects that the consortium intended at all times to pay the publishers and hence required payment from CDS within 88 days of the monthly report date so that the consortium could timely pay the publishers within 90 days of that date. Correspondence and a press release also provide corroborating evidence, stating that through the agreement, CDS would provide a significant service benefit to the publishers, and that the parties strengths would benefit the publishers in significant ways. "Something more is here than a mere incidental benefit, or a mere indirect or collateral advantage, a lucky find or windfall, the accidental consequence of a promise conceived for

the good of some one else." See Edward McClare v. Massachusetts Bonding & Insurance Company, 266 N.Y. 371, 376 (1935). The entire arrangement was to sell books on behalf of the publishers, pay the publishers and then collect a service charge. The publishers were third party beneficiaries.

The consortium pledged its contract rights under the Agency Fulfillment Agreement to the bank and, therefore, the bank is considered an assignee of those rights. Septembertide Publishing, B.A. v. Stein and Day, Inc., 884 F.2d 675, 677 (2d Cir. 1989). As an assignee under New York law, the bank "stands in the shoes of its assignor [i.e., the consortium,] and takes subject to the liabilities of its assignor. . ." Id. at 682. Certainly, the debt owed by the consortium to each of the publishers as third party beneficiaries of the Agency Fulfillment Agreement constitutes liability. Whether such liability is subordinate to the bank's security interest (and the extent of this liability to each of the appellant publishers) was not addressed by the bankruptcy court and, accordingly, the matter is remanded for this determination.

## CONCLUSION

For the foregoing reasons, the order of the United States Bankruptcy Court confirming the debtor, Publishers Consortium Inc.'s plan of reorganization under Chapter 11 of the United States Bankruptcy Code is REVERSED. The judgment for the

appellee, American National Bank and Trust Company of Chicago, in adversary proceeding no. 02-03048 is hereby VACATED and the matter REMANDED with instructions to reconsider the matter and the extent of the bank's financial interest and each of the publisher-appellants' interests as third party beneficiaries of the Agency Fulfillment Agreement.

It is so ordered this 9th day of December 2004 at Hartford, Connecticut.

Alfred W. Covello
United States District Judge